# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| GERARDO RODRIGUEZ, MANALI OLEKSY and all others similarly situated,<br><br>*Plaintiffs,*<br><br>vs.<br><br>THE CITY OF GREEN BAY<br><br>*Defendant.* | Civil Action<br><br>No. 1:20-cv-1819<br><br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

### INTRODUCTION

The summer of 2020 will be known for its reawakening of people's awareness of racial inequality that continues to pervade our public institutions. Unfortunately, it will also be known for fearful over-reactions, arrests and censorship of the voices that tried to bring us that message. The City of Green Bay, despite early efforts to support these voices, decided to criminalize them.

On May 25th, George Floyd was senselessly and publicly killed by police officers in Minnesota, giving rise to nationwide protests over the killing and the extent of continued systemic racism in law enforcement. Peaceful protests in Green Bay took place every day that week. On the night of May 31st, as another day and night of peaceful protesting concluded, certain actors in downtown Green Bay left the group and committed crimes of vandalism and theft in the same vicinity of the protest. These crimes were immediately and unfairly attributed to the Black Lives Matter movement ("BLM"). [1]

---

[1] BLM is an organization founded in 2013 by three activist women in response to the acquittal of George Zimmerman for the murder of Trayvon Martin in Florida. Because the phrase "Black Lives Matter" became a defining chant of these protests, we will use the term loosely here to refer to the movement and its protests.

In direct response to these crimes, the Mayor declared a state of emergency and issued a city-wide curfew, following the lead of cities like Minneapolis and Milwaukee that were trying to stop rampant violence and rioting erupting in their cities. Unlike Minneapolis and Milwaukee, however, the streets of Green Bay were safe at night, except for the threat the City decided BLM protesters posed in exercising their First Amendment rights. This threat alone was both the justification and the purpose of the curfew.

As a result, Green Bay enacted a curfew "to prohibit anybody from being out in public streets" during curfew hours. However, through subsequent statements, both the City and the Green Bay Police Department assured people they would not be arrested or stopped unless they were engaging in "unlawful conduct." The City thus gave the Police Department unfettered discretion to decide what, in fact, violated the curfew. True to the curfew's purpose, the only people arrested for violating the curfew were protestors.

## THE PARTIES

1. Plaintiff Gerardo Rodriguez is a resident of the Village of Allouez, Brown County, Wisconsin.

2. Plaintiff Manali Oleksy is a resident of the City of Green Bay, Brown County, Wisconsin.

3. Defendant City of Green Bay is a corporation organized and governed under the provisions of Chapter 62, Wis. Stats., known as the mayor-council plan ("Green Bay" or the "City").

   a. The Green Bay Police Department is organized by the City of Green Bay to provide policing in Green Bay under the direction and control of the City.

b. Chief Andrew Smith is the duly appointed Chief of the Green Bay Police Department pursuant to Wis. Stat. § 62.13(3) and serves under the direction and control of the Mayor and City Council of Green Bay.

## JURISDICTION AND VENUE

4. This is a civil rights action under 42 U.S.C. § 1983.

5. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331(a) and 1343, because this action rises under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

6. Venue is proper under 42 U.S.C. §§ 1391(b) & (d), because the actions giving rise to this Action occurred within this district and all parties reside in this district.

## BACKGROUND

7. George Floyd was killed by Minneapolis police officers on May 25, 2020. The brutality of the incident garnered national attention.

8. In the wake of Floyd's killing, people took to the streets to protest the latest incident demonstrating systemic racism in the nation's policing.

9. These protests became associated with the Black Lives Matter movement ("BLM").

10. Although emotionally charged, the protests in Green Bay were entirely peaceful. As more people realized what happened to George Floyd and the extent of systemic racism in law enforcement, the movement grew.

11. On the night of May 31st, as a day and night of peaceful protesting concluded, certain actors unrelated to the peaceful protesters committed crimes of vandalism and theft in the same vicinity of the protests. These crimes were immediately and unfairly attributed to BLM.

12. During the week prior to May 31st, public uprising in Minneapolis, where George Floyd was murdered, resulted in wide-spread looting, arson and lawlessness. Minneapolis imposed a city-wide curfew to clear the streets and regain order in the city.

13. Milwaukee experienced similar wide-spread looting and other criminal activity and enacted a similar curfew requiring everyone to stay inside at night or be arrested.

14. Compared to Minneapolis or Milwaukee, the criminal activity in Green Bay was minor and isolated. With the exceptions of a person who shot a firearm into the air and another apparently struck by rock, the only crimes were petty theft and vandalism.

15. Chief Smith immediately began characterizing these events with terms such as "mob," "riot" and "looting."

16. The owner of the gas station where most of this occurred stated that the damage was relatively minor.

17. Nonetheless, on June 1st, the Mayor and Chief Smith held a lengthy press conference at which the City declared a state of emergency under Wis. Stat. § 323.11 and ordered a curfew imposed on all City residents until further notice.

18. The Mayor of Green Bay invoked this emergency power at the recommendation and insistence of Chief Smith. The sole reason for invoking the emergency curfew power was the incidents of May 31st.

19. In public comments, Chief Smith consistently referred to the unidentified criminals as BLM protesters.

20. The resulting "Curfew" was not a curfew at all. A curfew, by definition, is a law that prohibits people from being in public between certain hours. It is activity neutral, meaning

the conduct of a person in public is irrelevant. It is a drastic emergency measure that makes the mere act of being in public illegal.

21. On June 1st, the Mayor announced a curfew for all persons in Green Bay from 9 p.m. until 6 a.m. on June 3.

22. As announced, the Mayor's curfew was a conduct-neutral "true" curfew such as those in place in Minneapolis and Milwaukee. It was never presented as a restriction on the time, place and manner of political speech or any particular conduct.

23. People began to complain about the Curfew as announcements were made that it would apply to joggers and people walking their dogs. As the people of Green Bay started to realize the effect of the Curfew on their daily routines, they expressed concerns whether the curfew was necessary.

24. Within hours of the Curfew announcement, the City responded to these concerns through a series of *ad hoc* exceptions to the Curfew.

25. First, the Curfew was relaxed to allow businesses to stay open and people to leave their homes to go there, including bars and restaurants downtown where the looting occurred.

26. Later on June 1st, the police department "clarified" that although it applied to all, the police would only use it on groups of people or people "engaged in illegal activity."[2]

27. When the Curfew hour came, the police used this discretion in line with the understood, but unstated purpose of the curfew—their only enforcement efforts were directed at stopping any BLM protesters critical of the police.

---

[2] <https://www.wbay.com/content/news/Green-Bay-extends-curfew-through-Monday-morning-570972211.html> (June 2, 2020)

28. Just before the appointed Curfew hour, hundreds of people were out in public from Walnut Street to Main Street between Washington Street and the City Deck, enjoying the weather and wandering in and out of the area's bars and restaurants.

29. At the same time, a group of peaceful BLM protesters were on the sidewalk around the corner of Walnut and Washington Streets.

30. Everyone in the area was about to violate the Curfew, not just the group of protesters.

31. The police ignored the crowds on the streets and sidewalks and instead prepared for the 9:00 p.m. Curfew by staging arrest vans and officers in tactical gear around the corner from the protesters.

32. At the appointed hour, police told the protesters—and only the protesters—that they were violating the Curfew and had to go home. The protesters were barely given time to comply before teams of officers with assault rifles at the ready arrested them with a clear show of force and deposited them in the unmarked vans.

33. These initial arrests were a clear message by the Police Department that BLM protesting would not be tolerated under the Curfew.

34. The tactic worked. The chilling effect from the first night of arrests halted almost all BLM protests while the Curfew remained in effect.

35. The City Council met on June 2nd to ratify and extend the emergency curfew, as required by the State's emergency declaration statute, Wis. Stat. § 323.11.

36. The Curfew presented to and ratified by the Council was entirely conduct-neutral, providing no evidence of its intended use to focus on and criminalize BLM speech.

37. The Curfew passed by the Council applied to:

> **all persons** from 9:00 p.m. until 06:00 a.m. beginning on June 1st, 2020, and ending on June 8th, 2020, unless earlier terminated if the Mayor and Emergency Operations Manager determine that the conditions giving rise to the emergency no longer exist. **All persons shall cease** vehicular and pedestrian travel on the public way, streets, sidewalks and highways and return to their homes, places of work or other convenient place.

(Resolution of June 2, 2020) (emphasis supplied).

38. The agenda and minutes from the Council demonstrate that the Curfew, however worded, was a response to stop BLM protests generally and the threat of violence and illegal activity Chief Smith linked to these lawful protests.

   a. At the video Council meeting, the members of public invited to speak on the issue were two BLM activists and organizers who were concerned the Curfew was aimed at restricting how and when they could get their message to the public.

   b. The discussion centered almost exclusively on how to prevent BLM protest-related crimes like those on May 31st, and whether the events of that day actually warranted a broad surrender of City residents' right to be in public.

   c. Chief Smith, the primary advocate for the Curfew at the meeting, was asked to comment on how the previous night's Curfew worked. His response related only to the BLM protest activity the police stopped the night before.

39. Local activist Abby Ringel recognized the discussion seemed to be limited to stopping BLM protests. She specifically asked whether this was a public Curfew or one aimed at BLM:

> [Ms. Ringel:] So is it my understanding that then [sic] this curfew is strictly to prohibit protesters from protesting after 9 p.m.?

[City Attorney Chavez:] No, it is to prohibit ***anybody*** from being out in public streets after that time.[3]

40. On its face anyway, the City adopted a curfew ordinance that had nothing to do with speech.[4]

41. Chief Smith comments to the Council make clear both that a) he considered BLM protests and criminality to be inseparable and b) that he intended to use the Curfew only to target BLM protests before their inevitable criminal conclusion. *See* Verbatim Minutes, at 56 ("really a protest at that point is people meandering around looking for trouble.")

42. The Council passed the resolution late on June 2, 2020.

43. As reported by the Green Bay Press-Gazette, the City originally advised: "Residents are prohibited from using public sidewalks and streets between 9 p.m. and 6 a.m., which includes going for a walk or jog."[5]

44. The public once again balked at the sacrifice of their liberties. In response, the City again quickly backed off and ensured people police would only focus on mass gatherings and illegal activities.[6]

---

[3] Minutes of the Common Council: Verbatim Minutes, June 2, 2020 at 51 (hereinafter, "Verbatim Minutes") (emphasis supplied).

[4] It is perhaps no accident that throughout the time the Curfew was in effect, what the Curfew actually said is unclear. The actual curfew law was not published or made readily available to the public while it was in effect. Under the City Charter Section 40.03, any ordinance is not effective until ratified by the Council and published. Notice of other ordinances passed at the June 2, 2020 meeting were published in the Press Gazette the following day, but nothing concerning the curfew. See Green Bay Press-Gazette, June 5, 2020 at 8B. With City Hall closed to the public, counsel requested the actual ordinance by email to the City Clerk, who is required to make these available for public inspection. The same request was sent to the City Attorney's office and Mayor's office. Neither responded with the actual text of the curfew until June 5, shortly before it was rescinded. There is great doubt whether the curfew was ever in effect at all. Despite being styled a "resolution," it was clearly a city ordinance prescribing a punishment for certain conduct within the City.

This procedural history is consistent with the allegations that the effect, if not the purpose, of the Curfew was to provide Chief Smith and the Police Department a tool to arrest any BLM protester on sight.

[5] <*https://www.greenbaypressgazette.com/story/news/2020/06/03/green-bay-george-floyd-protest-windows-broken-shots-reported/3138320001/*> (June 3, 2020).

[6] *Id.*

45. The City also later reformed the Curfew to say that businesses would be allowed to operate after 9 p.m.," and the public was free to patronize them.[7]

46. Eventually the City's pronouncements of what the Curfew covered rendered it meaningless. The City assured people *the Curfew did not apply to anyone "engaged in lawful activity."*

47. Under the City's pronouncements, the Curfew itself did not make anything illegal. The result was an ordinance leaving no constraints on the Police Department's ability to rid the streets of anyone it didn't want there.

48. Based on the arrests, those people were exclusively BLM protesters engaged in lawful speech critical of the police in general.[8]

49. Chief Smith and the Green Bay Police Department were left to act on his view that "really a protest at that point is people meandering around looking for trouble."[9]

50. The police did not even follow their own guidance to focus on "groups" and "unlawful activity." Instead, they exercised their authority based on race and the content of the protected speech:

51. **They did not focus on groups of people posing a threat.** An Hispanic man was arrested on June 4, 2020 for sitting—alone—in front of the police station where he did nothing but pray the rosary in contemplation of lives lost. He was taken to an outpost near Bay Beach and processed. The officers left him there rather than returning him to his car. Of course, by stranding him there on the road, he was violating the curfew just as much as when they arrested him.

---

[7] *Id.*

[8] Counsel is unaware of any instance where an arrest was made under the Curfew that also included an independent, "unlawful" activity.

[9] Verbatim Minutes, at 56.

52. **They did not break up groups of white, non-protesters.** On Thursday evening, June 4, for example, there were throngs of people out on a warm, June night just before 9:00 p.m., many of them in groups. An officer walked from the north end of the City Deck to the south end ignoring every group. At the south end, a small group of six or eight young Black and Latinx people were boxing up candles from a small vigil. Even though they were obviously preparing to leave, the officer nonetheless stopped to make sure they knew the Curfew would apply to them if they stayed.

53. **They did limit enforcement to otherwise "unlawful" conduct** – The Police had already determined what conduct would become "illegal" solely due to the Curfew. They followed BLM protesters, got personnel in place and waited for the supposed nine o'clock curfew. When officers instructed them to stop and they did not immediately leave, vans already staged nearby pulled up to several of the protesters. A squad of officers jumped out of the vans, quickly using teams of three to arrest individual protesters and put them in the vans. This was done with personnel and physicality that was not needed for two young women and a man holding signs. As a further show of intimidation, an officer stood with his long rifle at the ready. ***In other words, Green Bay Police had already decided that what was perfectly legal at 8:59 p.m. somehow became illegal at 9:00 p.m.***

54. The facts in the preceding paragraph and the fact that the only people arrested or cited for violating the Curfew were BLM protesters cannot be explained by the language of the Curfew or any public announcement regarding the Curfew.

55. The pattern of arrests could only be the result of a coordinated policy to use the Curfew to ban BLM protests and arrest protesters or people who fit the profile of the criminal "protesters" from the night of May 31st.

## PLAINTIFF ALLEGATIONS

56. Named Plaintiff Gerardo Rodriguez is a resident of Allouez, Wisconsin. He is Hispanic.

57. On June 4, 2020, Mr. Rodriguez knelt in the grass across the street from the Police Department in protest of police generally and their recent activity silencing protesters.

58. Police approached him, informed him he was violating the Curfew and told him to leave.

59. When he questioned why and refused to leave, he was arrested for violating the Curfew.

60. Violation of the Curfew was the only reason provided for his arrest.

61. Named Plaintiff Manali Oleksy is a resident of Green Bay, Wisconsin. She is of Indigenous decent.

62. Ms. Oleksy was engaged in lawful, BLM protest on the north sidewalk of Walnut Street the night of June 1, 2020.

63. At 9:00 p.m., police arrived and told her and other protesters that they were required to leave because of the Curfew.

64. When she did not immediately comply, she was arrested and physically thrown in the back of a van by a group of officers in tactical gear with another officer nearby with his assault rifle at his shoulder.

65. Violation of the Curfew was the only reason provided for her arrest.

## MUNICIPAL ALLEGATIONS

66. Defendant City of Green Bay, primarily through the Green Bay Police Department and Chief Smith, deprived the class of their federal rights as a result of a "policy" of the local government's legislative body and the acts done on behalf of the local government.

## CLASS ALLEGATIONS

67. All factual allegations pleaded above are incorporated herein.

68. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

69. The class consists of any person arrested or cited under the Curfew, as defined above.

70. The class is believed to include dozens of persons and is so numerous that joinder of all members in not practicable.

71. The actual number of class members is known only to the Defendant.

72. Common questions of law and fact predominate over any question peculiar to individual class members.

73. The predominant questions include:

    a. Whether the City of Green Bay had a policy to arrest protesters engaged in lawful, protected activity;

    b. Whether the City of Green Bay used a content-neutral Curfew ordinance to target and stop BLM protesters;

    c. Whether the Curfew enacted by the City of Green Bay was valid and enforceable under the First, Fifth and Fourteenth Amendments to the United States Constitution; and

    d. Whether the Curfew as enforced by the City of Green Bay and the Green Bay Police Department violated the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

74. Named Plaintiffs will fairly and adequately protect the interest of the Plaintiff Class. Plaintiffs have no conflicts involving other class members or Defendants. Plaintiffs

understand their role as a class representative and their duties to the class in this litigation. Plaintiffs are represented by counsel experienced in class actions and Federal litigation.

## CAUSES OF ACTION

### COUNT ONE

### SELECTIVE ENFORCEMENT BASED ON CONTENT OF PROTECTED SPEECH

75. All factual allegations pleaded above are incorporated herein.

76. The Curfew on its face applied to **all** persons seeking to engage in "vehicular and pedestrian travel on the public way, streets, sidewalks and highways."

77. The City knowingly or recklessly used the Curfew to target only BLM protesters precisely because of the content of their message.

78. There is no doubt the curfew was a reaction to sporadic violence the City blamed on BLM.

79. The City knew it could not criminalize BLM speech *per se*. Instead, it allowed or instructed the police to do through enforcement what it could not do by legislation or emergency power.

80. Those arrested for violating the Curfew differed from those who violated the Curfew but were not arrested only in that they were engaged in protected speech critical of the police.

81. Defendants violated the Plaintiffs' civil rights protected under the First, Fourth (illegal seizure), Fifth (substantive and procedural due process) and Fourteenth (equal protection) Amendments to the Constitution of the United States.

82. Plaintiffs and the Proposed Class suffered damages as a result of the Defendant's conduct.

## COUNT TWO

## THE "CURFEW" WAS UNCONSTITUTIONALLY VAGUE

83. All factual allegations pleaded above are incorporated herein.

84. During the imposition of the curfew, the public was not aware of its actual requirements.[10]

85. The thousands of people strolling through public spaces as part of their usual nightlife surely did not think they were violating the law.

86. The Curfew, as presented to the public, was a series of statements and press releases that eventually resulted in a curfew that only prevented already illegal activities. An unnecessary reminder that doing something unlawful is, in fact, unlawful.

87. Using only the City's pronouncements, no one except the police could know in advance what activities could cause their arrest. Such laws violate due process and are void. A City cannot leave absolute discretion to police decide what is legal or not.

88. Particularly offensive here, is the use of deliberately vague ordinances against people complaining about the history of injustice towards black people. The laws struck down in developing the "void for vagueness" doctrine were primarily the "vagrancy" statutes used in the Jim Crow South (and elsewhere) to intimidate and subjugate black people. It is precisely this history and the lack of change people are protesting.[11]

---

[10] The actual curfew law was not published or made readily available to the public while it was in effect. Under the City Charter Section 40.03, any ordinance is not effective until ratified by the Council and published. Notice of other ordinances passed at the June 2, 2020 meeting were published in the Press Gazette the following day, but nothing concerning the curfew. See Green Bay Press-Gazette, June 5, 2020 at 8B. With City Hall closed to the public, I requested the actual ordinance by email to the City Clerk, who is required to make these available for public inspection. The same request was sent to your office and the office of the Mayor. I did not receive the actual text of the curfew until June 5, shortly before it was rescinded. There is great doubt whether the curfew was ever in effect at all. Despite being styled a "resolution," it was clearly a city ordinance prescribing a punishment for certain conduct within the City.

[11] The horribly slow pace of eradicating these anti-black vagrancy statutes are seen most vividly in the dissents. *See, e.g.*, *Winters v. New York*, 333 U.S. 507, 540 (1948) (Justice Frankfurter dissenting); *Edelman v.*

89. The Curfew enacted by the Defendants violated the Fifth Amendment's substantive due process, as applied to States through the Fourteenth Amendment to the Constitution of the United States.

90. Plaintiffs and the Proposed Class suffered damages as a result of the Defendant's conduct.

## COUNT THREE

### SELECTIVE ENFORCEMENT OF THE "CURFEW" BASED ON RACE

91. All factual allegations pleaded above are incorporated herein.

92. The curfew was not upheld according to its terms.

93. It was applied only to BLM advocates who were predictably likely to belong to a protected racial class than the many other groups of people allowed to walk freely.

94. The intent of the law was to respond to perceived criminal BLM protesters and prevent future BLM protests comprised of "people meandering around looking for trouble."

95. Because the selected target of the enforcement was a group called Black Lives Matter, the arrests and citations were necessarily made on the basis of race or with intentional or reckless disregard of the disparate impact enforcement would have on the basis of race.

96. Defendants violated the Plaintiffs' civil rights protected under the Fifth (substantive and procedural due process) and Fourteenth (equal protection) Amendments to the Constitution of the United States.

97. Plaintiffs and the Proposed Class suffered damages as a result of the Defendant's conduct.

## RELIEF REQUESTED

---

*California*, 344 U.S. 357, 362 (1953) (Justice Black dissenting); *Hicks v. District of Columbia*, 383 U.S. 252 (1966) (Justice Douglas dissenting).

WHEREFORE, Plaintiffs, individually and on behalf of the Proposed Class, request the following relief:

98. An order declaring the Curfew, in any or all of its forms, unconstitutional;

99. An order certifying the Proposed Class and determination this action may proceed as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(1) & (2).

100. An order appointing Plaintiffs as Class Representatives and designation of their counsel as class counsel;

101. An injunction barring further prosecution under the Curfew;

102. An order reversing all judgments of conviction and pleas of guilt or no contest under the Curfew;

103. An order to expunge records of the arrests, including information such as fingerprints taken as the result of the arrest;

104. Damages sufficient to compensate Plaintiffs for their injuries, included without limitation compensatory, pecuniary and medical expense damages;

105. An award of prejudgment interest;

106. An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

107. Such further relief as the Court may deem fair and just.

## JURY DEMAND

Plaintiffs demand a trial by jury on all triable issues.

Respectfully submitted,

s/ David R. Hassel

DAVID R. HASSEL – NO. 1116934

**ATTORNEY FOR PLAINTIFFS**

HASSEL LAW
520 SOUTH WEBSTER AVENUE
GREEN BAY, WI 54301
TEL: (920) 606-2479
EMAIL: DAVID@HASSEL-LAW.COM

DATED: December 9, 2020